2015 IL App (4th) 140043

NOS. 4-14-0043, 4-14-0417, 4-14-0418 cons.

**FILED**

April 27, 2015
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| SHANNON PETERS, | ) | Appeal from |
|         Plaintiff-Appellant, | ) | Circuit Court of |
|         v. (No. 4-14-0043) | ) | Adams County |
| JOYCE RIGGS; THE CITY OF QUINCY, a Municipal | ) | No. 13L17 |
| Corporation; and AMEREN ILLINOIS COMPANY, | ) | |
| an Illinois Corporation, | ) | |
|         Defendants-Appellees, | ) | |
|         and | ) | |
| JOYCE RIGGS, | ) | |
|         Counterplaintiff, | ) | |
|         v. | ) | |
| THE CITY OF QUINCY, a Municipal Corporation; and | ) | |
| AMEREN ILLINOIS COMPANY, an Illinois | ) | |
| Corporation, | ) | |
|         Counterdefendants. | ) | |
| _____ | ) | |
| SHANNON PETERS, | ) | |
|         Plaintiff, | ) | |
|         v. | ) | |
| JOYCE RIGGS; THE CITY OF QUINCY, a Municipal | ) | |
| Corporation; and AMEREN ILLINOIS COMPANY, | ) | |
| an Illinois Corporation, | ) | |
|         Defendants, | ) | |
|         and | ) | |
| JOYCE RIGGS, | ) | |
|         Counterplaintiff-Appellant, | ) | |
|         v. (No. 4-14-0417) | ) | |
| THE CITY OF QUINCY, a Municipal Corporation; and | ) | |
| AMEREN ILLINOIS COMPANY, an Illinois | ) | |
| Corporation, | ) | |
|         Counterdefendants-Appellees. | ) | |
| _____ | ) | |

| | |
|---|---|
| SHANNON PETERS, ) | |
|         Plaintiff-Appellant, ) | |
|         v.  (No. 4-14-0418) ) | |
| JOYCE RIGGS; THE CITY OF QUINCY, a Municipal ) | |
| Corporation; and AMEREN ILLINOIS COMPANY, ) | |
| an Illinois Corporation, ) | |
|         Defendants-Appellees, ) | |
|         and ) | |
| JOYCE RIGGS, ) | |
|         Counterplaintiff, ) | |
|         v. ) | |
| THE CITY OF QUINCY, a Municipal Corporation; and ) | |
| AMEREN ILLINOS COMPANY, an Illinois ) | Honorable |
| Corporation, ) | Thomas J. Ortbal, |
|         Counterdefendants. ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Steigmann and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        In January 2013, plaintiff, Shannon Peters, was struck by a vehicle as she crossed a city street in Quincy, Illinois. She filed an action against defendants, Joyce Riggs, the driver of the vehicle that struck her; the City of Quincy, a municipal corporation (City); and Ameren Illinois Company, an Illinois corporation (Ameren), seeking to recover damages for the injuries she sustained during the incident. Peters' claims against the City and Ameren were based on allegations that nonfunctioning streetlights in the location of the accident created an unreasonably unsafe condition. Riggs filed a counterclaim for contribution against the City and Ameren. Both the City and Ameren filed motions to dismiss all counts against them, which the trial court ultimately granted. Peters and Riggs both appealed and their appeals have been consolidated for review. We affirm.

¶ 2                                I. BACKGROUND

¶ 3        On January 7, 2013, at approximately 6:28 p.m., Peters was struck by Riggs' vehicle as she attempted to walk in a northerly direction across Chestnut Street "between 18th and 20th Streets" in Quincy, Illinois.  On June 7, 2013, she filed an amended complaint against defendants.  She brought one count of negligence against each defendant and an additional count against the City alleging willful and wanton conduct.

¶ 4        Peters alleged Chestnut Street was a public roadway in Quincy that ran east and west.  It intersected with 18th and 20th Streets, both of which ran north and south.  Peters alleged she was struck by Riggs' vehicle while crossing Chestnut Street "between 18th and 20th Streets."  She further alleged that she was a Quincy University student and that residence halls were located on a portion of the south side of Chestnut Street between 18th and 20th Streets.  A student parking lot was located on the north side of Chestnut Street across from the residence halls.  Peters asserted the area surrounding the residence halls "was an area of high pedestrian traffic, including students from Quincy University."

¶ 5        Additionally, Peters alleged the City "owned and maintained" three or more streetlights that were located on the south side of Chestnut Street between 18th and 20th Streets and that Ameren had entered into a contract with the City to "repair and maintain street lights and other equipment."  According to Peters, on the date she was struck by Riggs, "one or more of the street lights on the south side of Chestnut Street between 18th and 20th Streets *** were not functioning."  Her complaint included allegations that, in July 2010, a City employee sent an e-mail to an Ameren employee asking that it repair two streetlights at the location at issue.  Peters alleged the nonfunctioning streetlights created an unreasonably unsafe condition on the date she was injured.

- 3 -

¶ 6        With respect to her negligence count against the City (count II of her amended complaint), Peters alleged the City owed a duty "to exercise reasonable care in the ownership and maintenance of the three or more street lights on the south side of Chestnut Street between 18th and 20th Streets." She asserted the City breached its duty by committing various negligent acts or omissions, including failing to (1) maintain its streetlights in a reasonably safe condition, (2) inspect the streetlights to see if they were functioning, (3) act with reasonable care to fix the streetlights, and (4) follow up with Ameren to ensure the streetlights were fixed. Peters alleged she sustained injuries as a direct and proximate result of the City's negligent acts or omissions.

¶ 7        Peters also alleged willful and wanton conduct on behalf of the City (count III of Peters' amended complaint). She asserted the City owed a duty to refrain from willful and wanton conduct in the ownership and maintenance of the streetlights at issue but breached that duty by exhibiting a conscious disregard or an utter indifference to the safety of others. Specifically, Peters alleged the City willfully failed to (1) maintain its streetlights in a reasonably safe condition, (2) inspect the streetlights to see if they were functioning, (3) act with reasonable care to fix the streetlights at issue, and (4) follow up with Ameren to ensure the streetlights were fixed. Again, she asserted the injuries she sustained were a direct and proximate result of the City's willful and wanton acts or omissions.

¶ 8        With respect to her negligence claim against Ameren, Peters alleged Ameren "owed a duty to exercise reasonable care in executing its contractual obligations, including its duty to exercise reasonable care in the repair and maintenance of the three street lights on the south side of Chestnut Street between 18th and 20th Streets." She asserted Ameren breached its duty by committing various negligent acts and/or omissions, including (1) failing to repair the

streetlights at issue in a timely manner; (2) failing to inspect the streetlights at issue to make sure they were functioning; (3) failing to perform contractual obligations under its contract with the City with respect to fixing, maintaining, and inspecting the streetlights at issue; (4) failing to exercise reasonable care in the repair and maintenance of the streetlights at issue; and (5) carelessly permitting the streetlights at issue "to remain in a non-working order when it knew or *** should have known that the resulting darkness created an unreasonably safe [*sic*] condition for pedestrians in the area." Peters also alleged she sustained injuries that were a direct and proximate result of Ameren's negligent acts or omissions.

¶ 9　　　　　On June 11, 2013, Riggs filed an answer and affirmative defense to Peters' amended complaint along with a countercomplaint for contribution against the City and Ameren. Riggs' claims for contribution—alleging negligence and willful and wanton conduct against the City and negligence against Ameren—essentially mirrored Peters' allegations against those same defendants.

¶ 10　　　　　On July 18, 2013, the City filed a combined motion to dismiss the counts against it in Peters' amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2012)), as well as a memorandum in support of its motion. First, it alleged both count II (alleging negligence) and count III (alleging willful and wanton conduct) of Peters' amended complaint should be dismissed pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)). The City asserted both counts failed to state a cause of action because Peters failed to allege facts showing that the City owed her a duty as an intended user of Chestnut Street. It cited section 3-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102 (West 2012)), which

provides as follows:

> "[A] local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition."

The City cited case law for the proposition that pedestrians walking mid-block and outside of an established crosswalk are generally not intended users of a street for whom a duty is owed.

¶ 11 The City also alleged count III should be dismissed pursuant to section 2-615 on the basis that Peters merely labeled conduct willful and wanton and failed to allege sufficient, well-pleaded facts to support that allegation. Specifically, it argued Peters failed to allege any facts showing the City "deliberately inflicted a highly unreasonable risk of harm to [Peters] in conscious disregard of it."

¶ 12 Second, the City alleged both counts should be dismissed pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2012)) because affirmative matter defeated Peters' claims. Specifically, it argued that, under section 3-102 of the Tort Immunity Act, it did not owe Peters a duty as an intended user of Chestnut Street. The City maintained Peters' allegations established that she did not cross Chestnut Street at its intersection with either 18th or 20th

- 6 -

Streets. Further, it asked the trial court to take judicial notice of the fact that no crosswalks were located on Chestnut Street between 18th and 20th Streets. The City attached the affidavit of Quincy police officer Christopher Mueller to its memorandum. Mueller averred he was the first police officer on the scene following the accident. He observed fire and ambulance personnel "mid-block on Chestnut Street between 18th and 20th Streets" and saw Peters, who was "located in the eastbound lane of Chestnut Street, approximately mid-block between 18th and 20th Streets." Mueller and another officer found and marked pools of blood. They also measured the scene. Mueller set forth his recorded measurements, noting the length of Chestnut Street between 18th and 20th Streets was 733 feet and the marked pools of blood measured 333, 335, and 344 feet from the east curb of 18th Street.

¶ 13        Also on July 18, 2013, the City filed a combined motion to dismiss the counts against it in Riggs' counterclaim for contribution. It adopted and incorporated by reference the facts and analysis set forth in its motion to dismiss Peters' amended complaint and supporting memorandum. The City argued it was not liable for contribution to Riggs if its motion to dismiss Peters' claims was granted and it was found not liable for her injuries.

¶ 14        On July 29, 2013, Ameren filed motions to dismiss the counts against it in both Peters' amended complaint (count IV) and Riggs' counterclaim for contribution (count III) pursuant to section 2-615 of the Code. With respect to Peters' amended complaint, Ameren argued Peters failed to "plead sufficient facts to establish a recognized duty of care by Ameren, a public utility, to a pedestrian crossing the street outside of a marked crosswalk." Additionally it argued that "[t]he alleged lack of street lighting at the time of the accident did nothing more than restore the location at which [Peters] chose to cross the street to its naturally occurring condition of

- 7 -

darkness which by its very nature is an open and obvious condition." Regarding Riggs' counterclaim for contribution, Ameren noted Riggs' allegations paralleled those made by Peters. It argued Riggs' counterclaim for contribution "should be dismissed for the same reasons as set forth in" its motion to dismiss Peters' amended complaint.

¶ 15 Also on July 29, 2013, Ameren filed a memorandum of law in support of its motion to dismiss Peters' amended complaint. It argued Peters failed to state a cause of action for negligence against it because she "failed to plead any facts establishing a duty owed to her by Ameren." Like the City, Ameren cited case law for the proposition that pedestrians are not intended users of streets when they are outside of a crosswalk. Further, it argued that the scope of its duty to Peters could be no greater than the scope of the duty owed by the City. Ameren also relied on cases from other jurisdictions for the proposition that utilities are not liable to pedestrians for injuries caused by nonfunctioning streetlights. Additionally, it argued it owed no duty to Peters because the darkness which resulted from the nonfunctioning street lights was an open and obvious condition.

¶ 16 On December 4, 2013, Peters filed responses to both the City's and Ameren's motions to dismiss. She attached various exhibits to her response to the City's motion, including photographs of the portion of Chestnut Street at issue. Peters provided a detailed description of the area at issue and asserted there were 12 pedestrian sidewalks on Chestnut Street between 18th Street and 20th Street that connected with Chestnut Street and which invited and encouraged pedestrians to enter the roadway. Six of those sidewalks were located on each side of the street. Peters noted three residence halls were located on the southeastern side of Chestnut Street between 18th Street and 20th Streets. Each residence hall had a sidewalk that extended from the

front of the building to the southern curb of Chestnut Street. One residence hall had two such sidewalks. The remaining eight sidewalks led from private residences to either the northern or southern curbs of Chestnut Street. Peters further alleged that, although curb parking was generally allowed on both sides of Chestnut Street, a portion of the south side of the street—from the corner of Chestnut Street and 20th Street and extending west in front of two of the three residence halls—was a no-parking zone. Additionally, a student parking lot was located on the north side of Chestnut Street directly across from one of the residence halls. Peters acknowledged there were no painted crosswalk markings on the portion of Chestnut Street at issue.

¶ 17          Peters asserted there were four overhead streetlights on the south side of Chestnut Street between 18th Street and 20th Street, which were owned, operated, and maintained by Ameren pursuant to a franchise agreement with the City. On the date Peters was struck by Riggs' vehicle, a streetlight on the south side of Chestnut Street in front of a residence hall was not functioning.

¶ 18          Peters argued she was an intended user of Chestnut Street based upon "the [12] pedestrian sidewalks that invited pedestrians into Chestnut Street between 18th Street and 20th Street." She maintained those 12 sidewalks were physical indications of the City's intent that pedestrians use Chestnut Street. Peters further argued she presented sufficient allegations to establish that the City's conduct was willful and wanton. In particular, she maintained she alleged sufficient facts to prove the City exhibited a conscious disregard for her safety by failing to maintain and fix the nonfunctioning overhead streetlight on Chestnut Street when it knew or should have known that students and other pedestrians commonly crossed Chestnut Street outside of a crosswalk.

¶ 19     In connection with her response to Ameren's motion to dismiss, Peters argued Ameren's duty did not derive from the duty owed by the City. She asserted Ameren was an independent contractor of the City and was excluded from the protections of the Tort Immunity Act. Instead, Peters argued Ameren's duty arose "from a contract between [the City] and Ameren wherein Ameren owned, operated[,] and maintained street lights in Quincy, including the street light at issue in this case" and was governed by common law. Unlike in her amended complaint (wherein she alleged the City owned the streetlights), she asserted the streetlights were not owned by the City "but rather leased to the [C]ity by Ameren." Peters alternatively argued that, in the event Ameren's duty was derived from the City's duty, "the [12] pedestrian sidewalks that connect with Chestnut Street between 18th and *** 20th Street establish a clear intent of [the City] to have pedestrians in the street, thereby making pedestrians intended and permitted users of Chestnut Street." Peters asked the trial court to deny Ameren's motion to dismiss or, alternatively, grant the motion without prejudice and give her leave to file an amended complaint.

¶ 20     Riggs filed a response to the City's and Ameren's motions to dismiss, adopting Peters' arguments. On December 20, 2013, following additional replies by both the City and Ameren, the trial court conducted a hearing on the matter. On December 27, 2013, it entered a written order. The court first set forth various assertions from the parties' filings that it accepted as true, including that Peters had been crossing Chestnut Street midway between 18th and 20th Streets. It also found that, in addition to sidewalks which ran parallel to Chestnut Street between 18th and 20th Streets, there were "various paved surfaces which [were] connected to the parallel sidewalk" and ran "perpendicular to the street curb." The court noted the portion of the curb that was connected to each perpendicular sidewalk had "no curb cuts or sloped surfaces connecting

- 10 -

the perpendicular, paved walkway to the surface of the adjacent street." Additionally, it found as follows:

> "There are no painted or other markings on the surface of Chestnut Street between 18th and 20th Streets and no signs or other physical manifestations designating or delineating a pedestrian cross[]walk at any of the perpendicular paved walkways connected to the street curb or any other locations on Chestnut Street between the inter-secting 18th and 20th Streets."

¶ 21        Based upon its factual findings, the trial court determined as a matter of law that Peters was not an intended pedestrian user of Chestnut Street at the location of the accident. As a result, the court granted with prejudice both the City's combined motion to dismiss counts II and III of Peters' amended complaint and counts I and II of Riggs' counterclaim for contribution. It also denied both Peters and Riggs the opportunity to file amended pleadings against the City. The court reserved ruling on Ameren's motions to dismiss. Finally, it made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that there was no just reason to delay the enforcement or appeal of the court's order as it related to the City.

¶ 22        On December 31, 2013, the trial court entered a second order. Initially, the court indicated that it had granted the City's combined motions to dismiss Peters' complaint and Riggs' counterclaim for contribution based upon both section 2-615 and section 2-619(a)(9) of the Code. Specifically, it stated as follows:

> "The court has ruled, by separate order, that the Amended Complaint fails to state a cause of action against [the City] because

it failed to allege that [Peters] was an intended user of the street at the point when she was struck by Riggs' vehicle while crossing Chestnut Street. The court further granted [the City's] Motion to Dismiss the Amended Complaint with prejudice pursuant to [s]ection 2-619 of the Code *** on the basis that the undisputed facts established, as a matter of law, that [Peters] was not an intended user of the street where the accident occurred because [the City] had not manifested an intent that pedestrians cross the street at the location in question."

¶ 23 Next, the trial court addressed the parties' arguments as they related to Ameren. The court first found it was evident that Peters' amended complaint premised Ameren's liability "upon Ameren's alleged violation of a claimed contractual duty to [the City] to maintain and repair street[]lights." However, the court stated it agreed with Ameren that "this derivative basis for Ameren's liability fail[ed] to state a cause of action against Ameren." It found Peters' amended complaint "otherwise *** lacking in any alleged duty owed by Ameren to [Peters]." The court noted Peters' contention that Ameren owed a common law duty to Peters that was "independent of any derivative claim with" the City but pointed out that her amended complaint failed to allege any such independent duty. The Court made the same findings with respect to Riggs' counterclaim, which it noted essentially paralleled Peters' claims against Ameren. Ultimately, the court granted both of Ameren's motions to dismiss but allowed Peters and Riggs the opportunity to file amended pleadings.

¶ 24 On January 14, 2014, Peters filed a notice of appeal (docketed by this court as

case No. 4-14-0043). She challenged the trial court's December 27, 2013, order, which granted the City's combined motion to dismiss counts II and III of her amended complaint.

¶ 25 On January 21, 2014, Peters filed a second amended complaint, alleging negligence against Riggs and both negligence and breach of contract against Ameren. She alleged Ameren "was in the business of supplying electric, power, and gas utilities to municipalities and [their] residents" and the City passed ordinances authorizing Ameren and its predecessor to construct, operate, and maintain an electric light, heat, and power system within Quincy. Peters further alleged Ameren owned electrical poles with attached lighting apparatuses on the south side of Chestnut Street between 18th and 20th Streets.

¶ 26 With respect to her negligence claim, Peters asserted that Ameren, as the owner of those poles and lights, had an obligation and duty to maintain them in a reasonably safe and workable condition. She alleged that, on or about the date of her January 2013 accident, Ameren knew or should have known that one or more of the streetlights at issue was not functioning. Further, she alleged Ameren breached its duty by committing one or more negligent acts or omissions, including (1) failing to inspect its poles and light apparatuses to make sure they were functioning, (2) failing to maintain its poles and light apparatuses in a reasonably safe and workable condition, (3) failing to repair or fix its poles and light apparatuses when it knew or in the exercise of reasonable care should have known that the lights were not functioning, and (4) carelessly permitting its streetlights to remain in nonworking order when it knew or in the exercise of reasonable care should have known that the resulting darkness created an unreasonably unsafe condition for pedestrians in the area. Peters asserted she sustained injuries as a direct and proximate result of Ameren's negligent acts and omissions.

- 13 -

¶ 27    In connection with her breach of contract claim against Ameren, Peters alleged that "as a consumer of electrical energy located within Quincy's corporate limits," she was a third-party beneficiary of the contract between the City and Ameren. Further she asserted Ameren "had a contractual obligation and duty" to construct, operate, and maintain its electrical poles and lighting apparatuses in a reasonably safe and workable condition. Peters alleged Ameren breached its contract by (1) failing to inspect its property to make sure that it was functioning, (2) failing to maintain its property in a reasonably safe and workable condition, (3) failing to repair and fix its property, and (4) carelessly permitting its streetlights to remain in nonworking order. Again, Peters asserted she sustained injuries as a direct and proximate result of Ameren's breaches of contract.

¶ 28    On January 22, 2014, Riggs filed an amended countercomplaint against Ameren. She first brought a claim for contribution, alleging negligence based upon Ameren's ownership of the street poles and lights and its contract with the City to repair and maintain streetlights and other equipment. Riggs alleged Ameren owed her "a duty at common law and by virtue of a voluntary undertaking *** to exercise reasonable care in executing its ownership and contractual obligations, including its duty to exercise reasonable care in the repair and maintenance of three streetlights on the south side of Chestnut Street between 18th *** and 20th Streets." She maintained Ameren breached its duty by (1) failing to repair the streetlights at issue in a timely manner, (2) failing to inspect the streetlights to make sure they were functioning, (3) failing to perform contractual obligations under its contract with the City, (4) failing to exercise reasonable care in the repair and maintenance of the streetlights, and (5) carelessly permitting the streetlights to remain in nonworking order. Riggs alleged Ameren's negligent acts or omissions con-

- 14 -

tributed to or proximately caused Peters' injuries.

¶ 29　　　　Riggs also brought a second negligence count against Ameren. She repeated the same allegations as in her first count but asserted that as a proximate result of Ameren's negligence she "sustained damage to her vehicle and [was] exposed to liability for" injuries and damages Peters' sustained.

¶ 30　　　　Finally, Riggs brought a third count against Ameren for breach of contract. She alleged that, as a motorist operating a vehicle on the streets of Quincy at night, she was a direct and intended third-party beneficiary of the contract between the City and Ameren. Riggs asserted Ameren owed her a duty by virtue of its contractual undertaking to repair and maintain the City's streetlights in a reasonably safe condition but breached its contract by (1) failing to timely repair the streetlights, (2) failing to inspect the streetlights, (3) failing to maintain the streetlights, and (4) carelessly permitting the streetlights to remain nonworking when it knew or should have known the resulting darkness created an unreasonably unsafe condition for pedestrians. Riggs alleged she sustained damage to her vehicle and was exposed to liability as a direct and proximate result of Ameren's breaches of contract.

¶ 31　　　　On February 13, 2014, Ameren filed motions to dismiss the counts against it in both Peters' second amended complaint and Riggs' amended countercomplaint. Both motions sought dismissal pursuant to section 2-615. With respect to Peters' second amended complaint, Ameren argued Peters' negligence count against it should be dismissed with prejudice because, as a matter of law, it did not owe a duty to Peters. It also asserted Peters failed to state a claim for breach of contract because Peters was not an intended or direct third-party beneficiary of the contract permitting Ameren to provide electrical services to the City.

¶ 32    In seeking dismissal of Riggs' amended countercomplaint, Ameren first argued that no liability existed based upon Riggs' claim for contribution because it did not owe a duty to Peters. Second, it asserted Riggs' negligence claim failed to state a cause of action because Ameren did not owe Riggs a common law duty, the voluntary undertaking theory did not apply, and the open and obvious doctrine precluded such a claim. Third, Ameren asserted Riggs failed to state a cause of action for breach of contract because she was not an intended third-party beneficiary of the contract between Ameren and the City.

¶ 33    Riggs additionally filed a motion to reconsider the dismissal of her original contribution claims against the City and sought leave to file a third-party complaint. She argued the City was "subject to liability in tort at common law, and by virtue of its breach of a voluntary undertaking, for failing to maintain the street[]lights in the area of the accident." Further, she maintained that the fact that the City could raise the Tort Immunity Act as an affirmative defense failed to negate the fact that it was "subject to liability in tort" as set forth in the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/2(a) (West 2012)). Additionally, Riggs maintained that because she, as a motorist, had been an intended and permitted user of Chestnut Street, her claim for contribution should not have been barred, regardless of whether Peters had been an intended user of Chestnut Street.

¶ 34    On March 7, 2014, the trial court conducted a hearing on Riggs' motion to reconsider. Following the hearing, the court denied the motion in part, but reserved ruling on the portion of her motion which concerned her desire to bring a direct negligence claim against the City. On March 19, 2014, Riggs filed a supplemental brief in support of her motion to reconsider. She also filed a motion to voluntarily dismiss and/or strike any and all claims she made for dam-

age to her vehicle in both her amended countercomplaint against Ameren and her proposed third-party complaint against the City. On March 27, 2014, following additional responsive pleadings by the parties, the court conducted a hearing to address pending matters, including Ameren's motions to dismiss the counts against it in Peters' second amended complaint and Riggs' amended countercomplaint, and arguments related to Riggs' motion to reconsider. The same date, it entered an order granting Riggs' motion to dismiss and/or strike any claim for property damage to her vehicle.

¶ 35    On April 21, 2014, the trial court entered its written order. It granted Ameren's motions to dismiss the counts against it in both Peters' second amended complaint and Riggs' counterclaim with prejudice. The court also denied Riggs' motion to reconsider the court's dismissal of her claims against the City in her original countercomplaint and her request for leave to file a third-party complaint against the City. Finally, the court entered findings pursuant to Rule 304(a), stating there was no just reason to delay the enforcement of, or appeal from, the court's order as it related to those issues.

¶ 36    On May 12, 2014, Riggs filed a notice of appeal from the trial court's April 21, 2014 order (docketed by this court as case No. 4-14-0417). On May 19, 2014, Peters also filed a notice of appeal from that order (docketed by this court as case No. 4-14-0418). Peters' and Riggs' appeals have been consolidated for review.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, both Peters and Riggs argue the trial court erred by granting the City's and Ameren's motions to dismiss the claims against them. The record reflects the City sought dismissal of the claims against it pursuant to sections 2-615 and 2-619(a)(9) of the Code while

Ameren sought dismissal of the claims against it under section 2-615.

¶ 39     "A motion to dismiss brought pursuant to section 2-615 of the Code attacks the legal sufficiency of the complaint." *In re Estate of Powell*, 2014 IL 115997, ¶ 12, 12 N.E.3d 14. Such a motion "presents the question of whether the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, and taking all well-pleaded facts and all reasonable inferences that may be drawn from those facts as true, are sufficient to state a cause of action upon which relief may be granted." *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25, 988 N.E.2d 984. "In ruling on a section 2-615 motion, the court only considers (1) those facts apparent from the face of the pleadings, (2) matters subject to judicial notice, and (3) judicial admissions in the record." *Reynolds*, 2013 IL App (4th) 120139, ¶ 25, 988 N.E.2d 984. "A complaint should be dismissed under section 2-615 only if it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover." *Powell*, 2014 IL 115997, ¶ 12, 12 N.E.3d 14. "[T]he plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action." *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155, 161, 920 N.E.2d 220, 223 (2009).

¶ 40     "A section 2-619 motion to dismiss admits the sufficiency of the complaint but asserts an affirmative defense or other matter that avoids or defeats the claim." *Illinois Ass'n of Realtors v. Stermer*, 2014 IL App (4th) 130079, ¶ 16, 5 N.E.3d 267. "Section 2-619(a)'s purpose is to provide litigants with a method of disposing of issues of law and easily proved issues of fact relating to the affirmative matter early in the litigation." *Hascall v. Williams*, 2013 IL App (4th) 121131, ¶ 16, 996 N.E.2d 1168. Section 2-619(a)(9) of the Code provides for dismissal where "the claim asserted against [the] defendant is barred by other affirmative matter avoiding the le-

gal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2012). "When ruling on the section 2-619(a)(9) motion, the court construes the pleadings 'in the light most favorable to the nonmoving party' [citation], and should only grant the motion 'if the plaintiff can prove no set of facts that would support a cause of action' [citation]." *Reynolds*, 2013 IL App (4th) 120139, ¶ 31, 988 N.E.2d 984.

¶ 41 A trial court's decision to grant a motion to dismiss pursuant to either section 2-615 or section 2-619 is subject to *de novo* review. *Stermer*, 2014 IL App (4th) 130079, ¶ 16, 5 N.E.3d 267. On review, "this court may affirm the trial court's judgment on any basis that is supported by the record." *Stoll v. United Way of Champaign County, Illinois, Inc.*, 378 Ill. App. 3d 1048, 1051, 883 N.E.2d 575, 578 (2008).

¶ 42 A. Peters' Claims Against the City

¶ 43 In her amended complaint, Peters brought claims alleging negligence and willful and wanton conduct against the City. "A complaint based upon negligence must set forth the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from that breach." *DiBenedetto v. Flora Township*, 153 Ill. 2d 66, 70, 605 N.E.2d 571, 573 (1992). Additionally, "[n]o separate and independent tort of willful and wanton conduct exists in Illinois." *Brooks v. McLean County Unit District. No. 5*, 2014 IL App (4th) 130503, ¶ 20, 8 N.E.3d 1203. Instead, a claim alleging willful and wanton conduct is viewed as an aggravated form of negligence and requires a plaintiff to plead and prove the basic elements of a negligence claim in addition to alleging "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Brooks*, 2014 IL App (4th) 130503, ¶ 20, 8 N.E.3d 1203.

¶ 44 Here, the City sought and was granted dismissal of Peters' claims against it on the

basis that it owed her no duty. "Whether a legal duty exists is a question of law to be determined by the court." *Powell*, 2014 IL 115997, ¶ 14, 12 N.E.3d 14. In Illinois, a general rule has evolved that, "since pedestrians are not intended users of streets, a municipality does not owe a duty of reasonable care to pedestrians who attempt to cross a street outside the crosswalks." *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 158, 651 N.E.2d 1115, 1117 (1995). Only a limited exception to this general rule exists "for pedestrians entering and exiting a lawfully parked vehicle as intended and permitted users of the street immediately surrounding the vehicle." *Harden v. City of Chicago*, 2013 IL App (1st) 120846, ¶ 20, 1 N.E.3d 1175 (citing *Curatola v. Village of Niles*, 154 Ill. 2d 201, 210-11, 608 N.E.2d 882, 886-87 (1993)).

¶ 45        The duty owed by the City in this instance is articulated in section 3-102(a) of the Tort Immunity Act, which provides as follows:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity *intended and permitted* to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used ***." (Emphasis added.)
> 745 ILCS 10/3-102(a) (West 2012).

This provision "does not impose any new duties on municipalities" and, instead, "codifies a municipality's general duty at common law to maintain its property in a reasonably safe condition." *Washington v. City of Chicago*, 188 Ill. 2d 235, 239, 720 N.E.2d 1030, 1033 (1999); see also *Wagner v. City of Chicago*, 166 Ill. 2d 144, 152, 651 N.E.2d 1120, 1124 (1995) ("[T]he purpose

of section 3-102(a) is not to grant defenses and immunities. Instead, it merely codifies, for the benefit of intended and permitted users, the common law duty of a local public body to properly maintain its roads. Immunities and defenses are provided in other sections.").

¶ 46        In *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 419-20, 592 N.E.2d 1098, 1099-100 (1992), a case relied upon by the City and Ameren, the plaintiff brought suit against a city and electrical company after her husband was struck and killed by an automobile as he attempted to cross a six-lane highway mid-block to get to his parked car. The plaintiff alleged the defendants were negligent in the placement and maintenance of streetlights on the highway. *Wojdyla*, 148 Ill. 2d at 419, 592 N.E.2d at 1099. The circuit court granted the defendants' motions for summary judgment and the plaintiff appealed. *Wojdyla*, 148 Ill. 2d at 419, 592 N.E.2d at 1099. Ultimately, the supreme court affirmed the grant of summary judgment in the defendants' favor on the basis that the decedent had not been an intended user of the highway where the accident occurred. *Wojdyla*, 148 Ill. 2d at 428, 592 N.E.2d at 1104. In so holding, the court stated as follows:

> "To determine the intended use of the property involved here, we need look no further than the property itself. The roads are paved, marked and regulated by traffic signs and signals for the benefit of automobiles. Parking lanes are set out according to painted blocks on the pavement, signs or meters on the sidewalk or parkway, or painted markings on the curb. Pedestrian walkways are designated by painted crosswalks by design, and by intersections by custom. These are the indications of intended use. That

pedestrians may be permitted to cross the street mid-block does not mean they should have unfettered access to cross the street at whatever time and under whatever circumstances they should so choose. Marked or unmarked crosswalks are intended for the protection of pedestrians crossing streets, and municipalities are charged with liability for those areas. Those areas do not, however, include a highway in mid-block." *Wojdyla*, 148 Ill. 2d at 426, 592 N.E.2d at 1102-03.

See also *Boub v. Township of Wayne*, 183 Ill. 2d 520, 525, 702 N.E.2d 535, 538 (1998) (holding "it is appropriate to look at the property involved in determining whether the plaintiff may be considered an intended and permitted user of the road and bridge where the accident occurred"); *Sisk v. Williamson County*, 167 Ill. 2d 343, 351, 657 N.E.2d 903, 907 (1995) (stating a court needs to "look no further than the property itself to determine the municipality's manifestations of intent with regard to use of the property by pedestrians").

¶ 47     In this case, Peters acknowledges that, to subject the City to liability for her injuries, she had to be an intended user of Chestnut Street.  Further, she agrees a court must look to the physical characteristics of the property at issue to determine a public entity's intentions with respect to the use of the property.  Here, Peters attempted to cross Chestnut Street between 18th and 20th Streets when she was struck by Riggs' vehicle.  She does not dispute the absence of a crosswalk in the area or that the accident occurred mid-block and not within an intersection.  Instead, Peters maintains "[t]he [12] pedestrian sidewalks that connect with Chestnut Street between 18th and 20th Streets midblock unequivocally establish [the City] intended for pedestrians

- 22 -

to use Chestnut Street where [she] was hit."

¶ 48　　　Here, we find the trial court's dismissal of Peters' amended complaint pursuant to section 2-615 of the Code was appropriate.　Specifically, Peters failed to plead sufficient facts to establish a duty owed to her by the City.　She alleged only that she "walked in a northbound direction across Chestnut Street between 18th and 20th Streets" and that the City "owed a duty to exercise reasonable care [(or refrain from willful and wanton conduct)] in the ownership and maintenance" of the streetlights on the south side of Chestnut Street.　Peters did not allege any facts to support a position that she was an intended user of Chestnut Street and, in particular, failed to reference the 12 pedestrian sidewalks she now claims are evidence of the City's intent that pedestrians use the area of Chestnut Street where her accident occurred.　As a result, we find the trial court's dismissal of Peters' claims against the City was appropriate pursuant to section 2-615 of the Code for failing to state a cause of action.　See *Hough v. Kalousek*, 279 Ill. App. 3d 855, 860, 665 N.E.2d 433, 436 (1996) ("Because [the] plaintiff did not plead that [the] decedent was standing in a crosswalk, the complaint did not establish any duty by [the public entity] towards the decedent.").

¶ 49　　　We note, although Peters did not allege the existence of the 12 pedestrian sidewalks in her pleadings, the trial court appears to have taken them into account in its consideration of the dismissal motions.　In its written order granting the City's motions to dismiss, the court stated as follows:

> "For purposes of the Motions, the court would further accept and
> find that between 18th and 20th [S]treets there are sidewalks which
> run and are located parallel to Chestnut Street and that there are

- 23 -

various paved surfaces which are connected to the parallel side-

walks, which run perpendicular to the street curb."

"Courts may take judicial notice of matters which are commonly known, or, if not commonly

known, are readily verifiable from sources of indisputable accuracy." *People v. Fisher*, 184 Ill.

2d 441, 455, 705 N.E.2d 67, 75 (1998).  Further, a court may take judicial notice of geographical

facts and "case law supports the proposition that information acquired from mainstream Internet

sites such as MapQuest and Google Maps is reliable enough to support a request for judicial no-

tice." *People v. Clark*, 406 Ill. App. 3d 622, 633, 940 N.E.2d 755, 766 (2010).

¶ 50          Here, although no party requested it do so, the trial court's comments indicate it

took judicial notice of the existence of the 12 pedestrian sidewalks relied upon by Peters.  The

record contains support for such action in the form of printouts from Google Earth and Google

Maps, which depict the area of Chestnut Street in question.  Additionally, we note the City does

not dispute the existence of the 12 sidewalks at issue.  Relying on these additional facts, the court

determined Peters was not an intended user of Chestnut Street "within the meaning of applicable

law."  We agree and find, as a matter of law, that even considering the 12 pedestrian sidewalks at

issue, no duty was owed by the City to Peters.

¶ 51          As stated in *Wojdyla*, 148 Ill. 2d at 426, 592 N.E.2d at 1103, "[p]edestrian walk-

ways are designated by painted crosswalks by design, and by intersections by custom," and such

are "indications of intended use."  More recently, the First District additionally looked to the ab-

sence of curb cuts or slopes for pedestrian access when determining that the nature of the city

property at issue indicated pedestrians were not intended users of a city street.  *Dunet v. Sim-

mons*, 2013 IL App (1st) 120603, ¶ 29, 989 N.E.2d 279.  In this case, it is undisputed that no

painted crosswalk existed on Chestnut Street between 18th and 20th Streets and Peters was not crossing Chestnut Street at an intersection. Further, we find nothing in the record to show that the 12 perpendicular sidewalks along Chestnut Street also contained curb cuts or slopes, which could indicate pedestrians were intended to access the street at those 12 locations. (In its written order, the trial court specifically found no curb cuts or sloped surfaces existed.) In short, while pedestrians may have been intended users of those perpendicular sidewalks, we find nothing which would evidence an intention by the City that pedestrians continue into *and across* the street at those locations.

¶ 52 Peters cites three cases in support of her position on appeal. First, she relies on *Curatola*, 154 Ill. 2d at 215, 608 N.E.2d at 889, wherein the supreme court held a plaintiff's "use of the immediately surrounding street to exit his vehicle was permitted and intended." In so holding, the court stated the plaintiff's use of the portion of the street surrounding his vehicle "was mandated by virtue of the fact that he had parked his vehicle and had to exit or reenter it." *Curatola*, 154 Ill. 2d at 215-16, 608 N.E.2d at 889.

¶ 53 We find *Curatola* is factually distinguishable from the present case and sets forth only a narrow exception to the general rule that pedestrians are not intended users of a city street. Notably, in this case, Peters was not alleged to have been traversing an area of the street in order to access a parked vehicle. Rather, she attempted to cross Chestnut Street mid-block. Therefore, she was not in an area of the street that she was required to access. See *Vaughn*, 166 Ill. 2d at 161, 651 N.E.2d at 1118 (distinguishing *Curatola* on the basis that, in *Curatola*, "it was *impossible* for the pedestrian to access the vehicle or the sidewalk without walking in the street" (emphasis in original)). The holding in *Curatola* is inapplicable to Peters' claims.

- 25 -

¶ 54     Second, plaintiff cites *Kavales v. City of Berwyn*, 305 Ill. App. 3d 536, 539, 712 N.E.2d 842, 844 (1999), wherein an individual who had been walking on a sidewalk "fell after stepping into a depressed area of the pavement, as she was crossing a public alley." The First District looked to the nature of the property to determine whether the individual had been an intended user and noted the property at issue "was at the junction of a public alley and a street, more specifically, where the sidewalk converged with the alley, within the lateral lines of the sidewalk to the north and south of the alley." *Kavales*, 305 Ill. App. 3d at 543, 712 N.E.2d at 847. The court then relied on a provision of the Illinois Vehicle Code—requiring a driver emerging from an alley to yield the right-of-way to any pedestrian—to find that the legislature had made it "clear that pedestrians are intended users of such an area." *Kavales*, 305 Ill. App. 3d at 543, 712 N.E.2d at 847 (" 'The driver of a vehicle emerging from an alley *** shall stop such vehicle immediately prior to driving into the sidewalk area extending across such alley *** and shall yield the right-of-way to any pedestrian as may be necessary to avoid collision ***.' " (Emphases omitted.) (quoting 625 ILCS 5/11-1205 (West 1994))). Further, the court noted that while the intersection of the alley and the street was technically not a statutory intersection, citing to *Vaughn*, it found the intersection was the type "at which pedestrians are intended users by custom" and that she had been "in the 'sidewalk area,' which is intended for pedestrians." *Kavales*, 305 Ill. App. 3d at 544, 712 N.E.2d at 847-48.

¶ 55     We also find *Kavales* distinguishable. Again, Peters was injured while attempting to cross Chestnut Street mid-block. She was in the travelled portion of the street when struck and not in a location intended for pedestrians by custom. See *DeMambro v. City of Springfield*, 2013 IL App (4th) 120957, ¶ 25, 990 N.E.2d 1255 ("The primary lanes of the street are intended

- 26 -

exclusively for vehicles, subject to crosswalks and other specifically indicated pedestrian areas \*\*\*."). Additionally, unlike in *Kavales*, we find no statutory authority which would support Peters' position that she was an intended user of Chestnut Street at the location of her accident.

¶ 56 Third, Peters cites *Gutstein v. City of Evanston*, 402 Ill. App. 3d 610, 612, 929 N.E.2d 680, 684 (2010), wherein the plaintiff alleged she fell and was injured in an alley behind her home as she was attempting to reach a waste disposal bin provided for her use by the city. The First District first noted the general rule that an alley is a roadway designed for vehicular, rather than pedestrian, traffic. *Gutstein*, 402 Ill. App. 3d at 617, 929 N.E.2d at 688. However, it further noted that the city at issue had "established a policy requiring its residents to place their trash, recycling, and yard waste containers in the alley, which [was] municipal property." *Gutstein*, 402 Ill. App. 3d at 618, 929 N.E.2d at 689. The court found the logical inference from that policy was that the city also intended that a resident "be able to access [their] waste containers and that means walking in the alley in order reach them." *Gutstein*, 402 Ill. App. 3d at 621, 929 N.E.2d at 691. The court held that pedestrians were "intended users of the alley when they walk[ed] in the alley *only* to access their waste containers." (Emphasis added.) *Gutstein*, 402 Ill. App. 3d at 620, 929 N.E.2d at 691.

¶ 57 *Gutstein* is also distinguishable from the case at bar. Like *Curatola*, *Gutstein* sets forth only a narrow exception to a general rule. The facts of that case showed the municipality required its residents to place waste-disposal bins on city property and, as a result, it was expected that pedestrians would have to traverse city property to reach the bins. There was no similar requirement upon Peters in this case.

¶ 58 In her reply brief, Peters clarifies that she is not contending "that the [12 perpen-

- 27 -

dicular] sidewalks created *de facto* crosswalks but \*\*\* that the sidewalks are a physical manifestations [*sic*] that clearly establish that [the City] intended pedestrians to utilize Chestnut Street." The implication from Peters' argument is that the 12 sidewalks at issue evidenced an intent by the City that pedestrians were intended users of Chestnut Street between 18th and 20th Street *in its entirety* (an argument that Peters explicitly made before the trial court). We find such an expansively defined pedestrian way to be without legal support. In the absence of physical manifestations demonstrating Peters was an intended user of the travelled portion of a city street midblock and not within a crosswalk, we find her pleading failed to establish the City owed her a duty. The trial court committed no error in dismissing Peters' claims against the City.

¶ 59        In her response to the City's motion to dismiss, Peters requested leave to file an amended complaint; however, the trial court granted the City's motion to dismiss with prejudice. "Whether to dismiss an action with or without prejudice is a matter within the trial court's discretion." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1046, 904 N.E.2d 1183, 1191 (2009). "On review, we consider whether the court took the particular facts and unique circumstances of the case into account before determining that the case should be dismissed with prejudice." *Crull*, 388 Ill. App. 3d at 1046, 904 N.E.2d at 1191. Additionally, "a cause of action should not be dismissed with prejudice unless it is clear that no set of facts can be proved under the pleading which would entitle the plaintiff to relief." *Smith v. Central Illinois Regional Airport*, 207 Ill. 2d 578, 584-85, 802 N.E.2d 250, 254 (2003). Here, we find no abuse of discretion.

¶ 60        At a hearing on the motions to dismiss, Peters made assertions regarding what her amended pleadings would consist of, stating as follows:

        "[T]his is the pleading stage, and I would seek leave to amend the

- 28 -

plaintiff's Amended Complaint adding specific allegations about the plaintiff being an intended user based upon the physical characteristics of the property specifically the sidewalks that have been discussed here today and are addressed in the briefs, the number of them, their location, and the fact that we believe this indicates intent on behalf of the [C]ity. So I would seek leave to amend the Complaint consistent with the facts in the case."

Peters' representations to the trial court indicate any amendment to her pleading would have focused on the 12 perpendicular pedestrian sidewalks on Chestnut Street between 18th and 20th Streets and her position that those sidewalks were manifestations of the City's intent that pedestrians were intended users of Chestnut Street. As set forth above, the City owed no duty to Peters based upon the 12 pedestrian sidewalks and an amended pleading based upon those facts would not have stated a cause of action upon which Peters could have obtained relief.

¶ 61 Additionally, we note that both before the trial court and on appeal, Peters has not suggested the existence of any other facts which could support a finding of a duty owed by the City and upon which she could base an amended pleading. As a result, we find the court committed no error in dismissing Peters' claims against the City with prejudice.

¶ 62 B. Peters' Claims Against Ameren

¶ 63 In her second amended complaint, Peters brought claims against Ameren for negligence and breach of contract. She also raised a voluntary undertaking theory of liability when arguing her position before the trial court. Initially, we note that on appeal Peters does not raise any specific argument with respect to her breach of contract claim or voluntary undertaking

claim against Ameren. Therefore, as Ameren maintains, Peters has forfeited any claim of error related to the dismissal of those claims. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued [in an appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 64 With respect to Peters' ordinary negligence claim against Ameren, the record reflects the trial court granted Ameren's motion to dismiss pursuant to section 2-615 of the Code on the basis that Ameren owed no duty to Peters. On appeal, Peters argues the trial court erred because, as the owner of the streetlights on Chestnut Street, Ameren owed her a common law duty to maintain its property in a reasonably safe condition.

¶ 65 Both before the trial court and on appeal, Ameren relies on *Wojdyla* and *Dunet* to support its position that, like the City, it owed no duty to Peters because she crossed a city street mid-block and not within a crosswalk. As discussed, in *Wojdyla*, 148 Ill. 2d at 419, 592 N.E.2d at 1099, the plaintiff filed a complaint against a municipality and a utility company, alleging "negligence in the placement and maintenance of streetlights on the highway," after her husband was struck by a vehicle and killed while attempting to cross a highway. The supreme court affirmed the grant of summary judgment in favor of both defendants after finding no duty owed to the decedent because he was not an intended user of the highway. *Wojdyla*, 148 Ill. 2d at 428, 592 N.E.2d at 1104. In so holding, the court noted as follows: "The plaintiff has stated that [the utility company's] duties were co-extensive with the City's. Since [the utility company's] liabilities cannot be any greater than those of the City, the opinion will address itself primarily to the City." *Wojdyla*, 148 Ill. 2d at 420, 592 N.E.2d at 1100.

¶ 66 Similarly, in *Dunet*, 2013 IL App (1st) 120603, ¶ 1, 989 N.E.2d 279, the plaintiff

- 30 -

brought suit against a municipality and a utility company after the plaintiff's decedent was struck by a vehicle on a city street and killed. In that case, it was "undisputed that at the time of the accident, the streetlights near the intersection were inoperable and that decedent did not cross in a marked crosswalk." *Dunet*, 2013 IL App (1st) 120603, ¶ 1, 989 N.E.2d 279. Ultimately, the First District determined summary judgment in favor of both the municipality and the utility company was appropriate because the plaintiff failed to show the decedent was an intended user of the street and that the decedent was, therefore, owed a duty. *Dunet*, 2013 IL App (1st) 120603, ¶ 31, 989 N.E.2d 279.

¶ 67            Peters argues *Wojdyla* and *Dunet* are distinguishable from the present case because, here, Ameren owned the streetlights at issue. She contends that in *Wojdyla*, the utility's involvement was limited to the installation of streetlights owned by the municipality and in *Dunet*, the municipality had been responsible for maintaining and inspecting the streetlights. See *Wojdyla*, 148 Ill. 2d at 420, 592 N.E.2d at 1100 (noting the utility company "erected the lights lining" the highway); *Dunet*, 2013 IL App (1st) 120603, ¶ 15, 989 N.E.2d 279 (referencing testimony that an employee of the municipality "was in charge of repairing the streetlight power outage"). However, to support her position that Ameren's ownership of the streetlights warrants a different result, Peters relies on a premises-liability case. See *Ward v. K mart Corp.*, 136 Ill. 2d 132, 141, 554 N.E.2d 223, 227 (1990). We find case authority which sets forth the duties owed by landowners and occupiers is inapplicable to Peters' claims in the instant case. As noted by the trial court: "Ameren is not being sued by Peters as the owner of [the] premises upon which a dangerous condition was permitted. Rather Ameren is brought into this litigation for its alleged failure to provide or maintain a service (the illumination from its street[]lights)." Like the trial

court, we find *Wojdyla* and *Dunet* are supportive of Ameren's position that it owed no duty to Peters for failing to provide illumination on a city street where Peters was not an intended user of the city street because she crossed the street mid-block and outside of a marked crosswalk.

¶ 68 Additionally, we find no error in the trial court's decision to grant dismissal in Ameren's favor with prejudice. We note Peters had already been granted leave to amend her claims against Ameren and it was from her second amended complaint that dismissal was granted. Peters has not argued on appeal that the court's dismissal with prejudice constituted an abuse of its discretion or that she should be granted a further opportunity to amend her pleading.

¶ 69 C. Riggs' Claims for Contribution

¶ 70 On appeal, Riggs challenges the dismissal of her claims for contribution against the City and Ameren. She argues that the City—and, derivatively, Ameren—owed Peters a common law duty to maintain its property in a reasonably safe condition.

¶ 71 The Contribution Act provides that "where [two] or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them." 740 ILCS 100/2(a) (West 2012). "[A] party's obligation to make contribution rests on his liability in tort to the injured or deceased party, *i.e.*, the plaintiff in the underlying action." *Vroegh v. J&M Forklift*, 165 Ill. 2d 523, 528, 651 N.E.2d 121, 125 (1995). Although no requirement exists that the bases for liability among contributors be the same, "some basis for liability to the original plaintiff must exist." *Vroegh*, 165 Ill. 2d at 528-29, 651 N.E.2d at 125. Additionally, "a defendant cannot escape his statutory liability for contribution even though the plaintiff's complaint is subject to some procedural bar [citation] or immunity [cita-

tions] that might ultimately preclude the plaintiff from recovering from the defendant directly."
*Vroegh*, 165 Ill. 2d at 529-30, 651 N.E.2d at 125.

¶ 72　　　　According to Riggs, under the common law, the City's liability did not depend upon whether Peters was an intended and permitted user of the street where her injury occurred. She contends section 3-102(a) of the Tort Immunity Act (745 ILCS 10/3-102(a) (West 2012)) added the "intended and permitted" user language as a limitation, thereby granting an immunity to the City. To support her position, Riggs maintains that pre-1965 case law, which predates the Tort Immunity Act and embodies the common law, fails to suggest that courts "made any distinction between intended and permitted users of city property and those who were not." According to Riggs, if section 3-102 is viewed not as a codification of a municipality's duty to users of its premises but, instead, as a statutory immunity to be pleaded as an affirmative defense, she has adequately asserted a claim for contribution against the City and Ameren as they are "subject to liability in tort" under the Contribution Act.

¶ 73　　　　Here, we disagree with Riggs' assertion that section 3-102(a) does not define the City's duty and, instead, describes an immunity. The supreme court has held that section 3-102(a) "does not impose any new duties on municipalities" and, instead, codifies a municipality's duty at common law. *Washington,* 188 Ill. 2d at 239, 720 N.E.2d at 1033. Further, it has expressly stated that section 3-102(a) does not grant defenses and immunities and that "[i]mmunities and defenses are provided in other sections" of the Tort Immunity Act. *Wagner*, 166 Ill. 2d at 152, 651 N.E.2d at 1124. Thus, Riggs' position is contradicted by supreme court authority.

¶ 74　　　　Additionally, we disagree with Riggs' contention that no "distinction" existed in

pre-1965 case law for "intended and permitted" users of city property. A city's legal responsibility to maintain its property in a reasonably safe condition is not absolute and, even at common law, limitations on that responsibility existed. Although the case law may not express such limitations using the precise language found in section 3-102(a) of the Tort Immunity Act, we find several cases that discuss limitations on liability based on a municipality's intentions for use of the property at issue. See *Maxey v. City of East St. Louis*, 158 Ill. App. 627, 630 (1910) ("The true rule in all cases, we think, is that a city is only required to maintain the respective portions of its streets in reasonably safe condition for the purposes to which they are respectively devoted by the intention and sanction of the city."); *Kohlhof v. City of Chicago*, 192 Ill. 249, 251, 61 N.E. 446, 446 (1901) ("All portions of a public street, from side to side and end to end, are for the public use in the appropriate and proper method, but no greater duty is cast upon the city than that it shall maintain the respective portions of streets in reasonably safe condition for the purpose for which such portions of the street are, respectively, devoted."); *Thien v. City of Belleville*, 331 Ill. App. 337, 345, 73 N.E.2d 452, 456 (1947) ("Municipal corporations are not insurers against accidents, and the only duty cast upon the city is that it shall maintain the respective portions of the street in reasonably safe condition for the purposes to which such portions of the street are devoted."); *Cogdill v. City of Marion*, 22 Ill. App. 2d 99, 103, 159 N.E.2d 28, 30 (1959) ("A municipality is required to maintain its streets and sidewalks, including parkways, in a reasonably safe condition considering the use to be made of such area."); *Storen v. City of Chicago*, 373 Ill. 530, 535, 27 N.E.2d 53, 55 (1940) ("Sidewalks are intended for the use of pedestrians and the duty of a city is to build and maintain them in a reasonably safe condition for the purpose for which they are intended."); *VanCleef v. City of Chicago*, 240 Ill. 318, 327, 88 N.E.

815, 817 (1909) (stating "under ordinary circumstances it is the duty of a city to see that its streets are reasonably safe for the uses for which streets are intended").

¶ 75      Here, the trial court dismissed Peters' claims against the City and Ameren after finding neither defendant owed Peters a duty of care and, as a result, she could not state a viable cause of action against either defendant. Thus, dismissal against those defendants was not granted on the basis of an affirmative defense. As discussed, we agree with the trial court's decision and find neither the City nor Ameren owed a duty to Peters under the circumstances presented. According to *Vroegh*, because there was no basis for liability against the City and Ameren as to Peters, Riggs' contribution claims must also fail. Therefore, we find no error in the court's dismissal of Riggs' contribution claims.

¶ 76                                    III. CONCLUSION

¶ 77      For the reasons stated, we affirm the trial court's judgment.

¶ 78      Affirmed.